IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY LESLIE and TANYEKA LESLIE,<br><br>Plaintiffs,<br><br>v.<br><br>DAIMLER TRUCK NORTH AMERICA LLC f/k/a FREIGHTLINER LLC,<br><br>Defendant. | ) | Civil Action File No. 1:18-cv-03831-WMR |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT DAIMLER TRUCK NORTH AMERICA LLC'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF RUSSELL DUNN, PH.D.**

Plaintiffs Anthony Leslie and Tanyeka Leslie ("Plaintiffs") respectfully submit this Response in Opposition to Defendant Daimler Truck North America LLC's ("DTNA") Motion to Exclude the Report and Testimony of Russell Dunn, Ph.D.

## INTRODUCTION

This action arises from an accident in which Plaintiff Anthony Leslie was grievously injured by catastrophic burns that were suffered in a post-collision

explosion and fuel-fed fire involving his 2005 Freightliner Columbia, a heavy truck designed, manufactured and sold by DTNA, formerly known as Freightliner LLC (collectively "DTNA").[1] Plaintiffs have brought claims for negligence, failure to warn, loss of consortium, and punitive damages against DTNA, alleging that the subject truck's fuel system was defectively designed. (*See generally* Dkt. No. 1). Plaintiffs have named Dunn as an expert in risk and safety analysis, and specifically as an expert in a safety analysis technique known as Failure Modes and Effects Analysis ("FMEA"), which has broad applicability across all manufacturing industries.

Dunn intends to offer opinions regarding whether DTNA was required by industry standards and internal policies to perform a meaningful safety analysis of the subject truck's fuel system, and whether it sufficiently did so prior to Leslie's injuries. Dunn's opinions can be summarized as follows: DTNA did not conduct and document a sufficient safety analysis of the fuel system in the Freightliner Columbia, and the evaluation of other similar incidents and a properly conducted safety analysis

[1] In 2008 Freightliner LLC became DTNA. *Daimler History*, Daimler Truck North America, https://northamerica.daimlertruck.com/company/history/.

would have led to actions to reduce or mitigate fuel fed fires. (Ex. 1, Dunn Report; Ex. 2, Dunn Supp. Report).

DTNA argues that Dunn is not qualified to offer such opinions because of a lack of expertise in the heavy truck industry, because his opinion that DTNA should have performed a safety analysis is unreliable, and because his opinion is irrelevant and would have no bearing on the ultimate issue of causation. DTNA specifically declares that it has never adopted the safety analysis and industry recommendations relied upon by Dunn and that these processes are aspirational or optional. This argument is completely false and is undisputedly refuted by the evidence in this case, which demonstrates that at the time the subject vehicle was manufactured, DTNA had in fact adopted Dunn's proposed safety analysis, that DTNA had adopted industry guidance documents and standards, and that DTNA had an ongoing obligation to minimize risks associated with the subject vehicle by performing a safety analysis both prior to manufacture and post-manufacture.

Despite this, DTNA wholly failed to conduct a proper safety analysis of the Columbia fuel system, and this neglect is relevant to DTNA's failure to adopt a feasible alternative design. DTNA attempts to mask these failures by misrepresenting Dunn's testimony repeatedly throughout its brief and making

unnecessary forays into his testimony's content that are more relevant to its weight than admissibility. The Court should not be distracted by DTNA's ploys. For these and the following reasons, the Court should deny DTNA's motion.

## **RULE 702 STANDARD FOR EXPERT TESTIMONY**

Federal Rule of Evidence 702 provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining whether an expert's testimony is admissible, trial courts are required to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

## ARGUMENT

Dunn's opinions constitute non-scientific, experience-based testimony. While Dunn has never worked in the heavy truck industry, the safety analysis and FMEA processes of which he will testify are not unique to that industry and are in fact universal to the design process and have been adopted by DTNA. His experience-based methodology is reliable in that it applies his specialized knowledge of safety analysis to industry guidelines and DTNA internal documents in reaching the conclusion that DTNA should have conducted a sufficient safety analysis of the Freightliner Columbia's fuel system prior to Leslie's injuries. This opinion is relevant because it is probative of whether it was reasonable for DTNA to adopt its defective design of the subject fuel system.

### I. Dunn is qualified to offer testimony on safety analyses and FMEA processes and their applicability to a product designer and manufacturer.

DTNA argues that Dunn is not qualified to offer opinions on whether DTNA was required to perform a safety analysis because he is a chemical engineer who has never worked for a heavy truck manufacturer and is not an expert in heavy truck design. This is inconsequential to the legal question of whether he is qualified to offer opinions on failure analysis. To be clear, Dunn is not planning on offering

testimony specifically concerning heavy truck design. Instead, Dunn's opinions concern a risk assessment technique and its general applicability to all design and manufacturing processes, including that of the subject truck. Dunn has decades of experience with the applicability of safety analyses such as an FMEA across a variety of fields.

Contrary to DTNA's arguments, Dunn's expertise does not have to be narrowly tailored to match the exact point of dispute (*i.e.*, heavy truck failure analysis) in this case, and neither Rule 702 nor *Daubert* requires it to be so. It is not necessary for an expert to be eminently qualified in the field, and so long as he is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and the weight of the expert's testimony than to its admissibility. *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). "[T]he qualification standard for expert testimony is 'not stringent'." *Fair Fight Action, Inc. v. Raffensperger*, Civil Action No. 1:18-CV-5391-SCJ, 2020 WL 13565010, at *4 (N.D. Ga. Dec. 11, 2020) (citation omitted). Experience in a field alone may provide a sufficient foundation for expert testimony, if the expert can explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and

how that experience is reliably applied to the facts. *Frazier*, 387 F.3d at 1261. "[A]n expert with 'the education or background to permit him to analyze a given set of circumstances . . . can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in [regard to] the particular product even though he has not had actual experience with [it].'" *Trilink Saw Chain, LLC*, 583 F. Supp. 2d at 1304.

Dunn's expertise is in the area of safety analysis methodologies, including Hazard Operability Studies, Process Safety Management of Highly Hazardous Chemicals, Hazard Communication, and design FMEA ("DFMEA"), which is a process used by manufacturers when a new product design is created, as well as when field surveillance or reports of product performance indicate that a review of the product's design and function is necessary. *In re Yamaha Motor Corp. Rhino ATV Prods. Liab. Litig.*, 816 F. Supp. 2d 442, 451 n. 2 (W.D. Ken. 2011); (Ex. 3, Russell Dunn Dep. 136:15-139:20). The DFMEA process is not specific to any industry or product, and instead is a general form of risk assessment and safety analysis that was developed by NASA before it was adopted by the automotive industry. (*Id.* at 212:9-213:1; 258:19-24). The Society of Automotive Engineers

("SAE") has adopted the DFMEA process in a document known as SAE J1739.[2] (Ex. 4, SAE J1739-2002). SAE J1739 was copied from FMEA processes that were developed by Ford, **Chrysler**, and General Motors and is documented in what is now known in the automotive industry as the FMEA manual. (*Id.* at 3; Ex. 5, FMEA Manual 3rd Ed. Foreword 1st and 2nd Ed.). Chrysler and Daimler-Benz AG merged prior to the production of the subject vehicle.[3]

---

[2] SAE is a global association of engineers and technical experts in the aerospace, automotive and **commercial vehicle** industries, which includes the heavy truck industry. SAE International, https://www.sae.org/.

[3] The FMEA manual was first issued in February of 1993 by Chrysler, Ford, and General Motors. (Ex. 5, FMEA Manual 3rd Ed. Foreword 1st and 2nd Ed.). SAE J1739 was subsequently issued in 1994. (Ex. 4, SAE J1739-2002 p. 1). Allegedly, the fuel system of the 2005 Freightliner Columbia that is the subject of this action was developed as part of Freightliner's Century Class of heavy trucks, which were initially sold in 1996, after the creation of SAE J1739 and the FMEA manual. (Ex. 6, Anthony Moore 30(b)(6) Dep. 22:20-22, June 29, 2022). Daimler-Benz AG purchased Freightliner in 1981 and merged with Chrysler to form DaimlerChrysler AG in 1998, prior to the development of the subject vehicle and its specific fuel system. Julia Hollmann, Aleteia de Moura Carpes, & Thiago Anotonio Beuron, *The DaimlerChrysler Merger – A Cultural Mismatch?*, Rev. Adm. UFSM, Santa Maria, 431, 431 (2010). The Freightliner Columbia which is the subject of this action was not introduced until 1999. *Freightliner Produces Its 35,000th Columbia Truck*, Truckinginfo, https://www.truckinginfo.com/93130/freightliner-produces-its-35000th-columbia-truck. Although DTNA has attempted to portray the fuel system of the subject truck as substantially the same as a fuel system that had existed since the early 1990's, the Freightliner Columbia included specific changes to the Century Class's fuel system and front axle design. (Ex. 7, Moore 30(b)(6) Dep. 171:25-173:6, Nov. 19, 2019).

Dunn is a Professor of Chemical and Biomolecular Engineering at Vanderbilt University and has almost 40 years of industry and academic experience, including many years of experience as a chemical engineer for large industrial corporations, including Monsanto Chemical Company and General Electric. (Ex. 8, Dunn CV p. 1). As the president and founder of Polymer Chemical Technologies, LLC, Dunn has been involved in over 275 projects focusing on process and product design issues and has written over 200 technical reports on failure analysis. (*Id.*). At Vanderbilt, Dunn teaches all of the laboratory and design courses for chemical engineers, including safety courses encompassing a variety of safety analyses including the FMEA process. (Ex. 3, Dunn Dep. 12:11-21, 13:13-17, 17:8-18:4). This includes a practical laboratory course which requires students to perform an FMEA analysis with relation to chemical product and process design. (*Id.* at 151:7-19).

Dunn has reviewed over 100 FMEAs from various industries over his career and has performed safety analyses as part of his industrial career. (*Id.* at 149:3-12). He has consulted with suppliers of motor vehicle parts, which are undisputedly subject to the FMEA processes outlined in the FMEA manual and SAE J1739. (*Id.* at 44:19-45:1). He has provided expert testimony and opinions in at least 40 to 50 other cases on safety analysis, safety systems analysis, and FMEA analysis involving

a wide variety of products, including aircraft, surgical mesh, child car seats, tires, and seat belts. (*Id.* at 195:21-196:8, 227:7-11, 265:7-10, 416:20-25, 423:6-22, 425:16-426:3). Dunn has investigated the failure of vehicle components and systems previously, albeit not in the specific area of heavy truck fuel systems. Dunn's expertise in product safety analyses obviously spans a range of products and encompasses not only practical experience with performing safety analyses, but also a wide-ranging knowledge of the application of safety analyses to different industries.

Dunn's own testimony provides a compelling basis for the Court to find that his opinions on safety analysis are admissible in this case. It is not necessary for a witness to have expertise specifically in heavy truck design to have opinions on the safety analysis' and FMEA process's applicability to the heavy truck industry:

> Q. Well, the truth is, you're not qualified to do an FMEA on a heavy truck, are you?
>
> A. Yes, I am, to – okay. So when you say "do an FMEA," to be on an FMEA team, absolutely. To be an FMEA facilitator, absolutely. I can facilitate them through – I facilitate when I teach these processes and I teach all the students.
>
> Q. Don't-

A. When you say "do an FMEA," there's no person that does an FMEA. It's a team.

Q. Wouldn't you put people on the team who actually know something about heavy truck design?

A. That's just one element. That's – you need marketing people. You need – you need an FMEA expert. In fact, that's written into the document that you need somebody who's an expert on the process. And I believe my engineering skills are such that I would be a valuable asset to an FMEA team.

(*Id.* at 174:18-175:14). This is reinforced by DTNA's own internal documents, dating prior to the manufacture of the subject truck, which demonstrate that the DFMEA process is a team approach utilizing individuals from a variety of backgrounds. (Ex. 9, DTNA027700-27703).[4] Permitting Dunn to provide testimony and opinions in this case would be consistent with decisions from numerous other jurisdictions which have found that an expert may be qualified even if his expertise does not precisely match the exact point of dispute. *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001); *In re Yamaha*, 816 F. Supp. 2d at 451-52; *Hickerson v. Yamaha Motor Corp.*, Civil Action No. 8:13-cv-02311-JMC, 2016 WL 4123865, at *3-4 (D.S.C. July 29, 2016); *Menard, Inc. v. Dallas Airmotive, Inc.*, 18-cv-844-wmc,

[4] This document also indicates that DTNA's design practices call for safety evaluations of existing products on an ongoing basis.

2020 WL 5440333, at *4-5 (W.D. Wis. Sep. 10, 2020); *Square D Co. v. Hayson*, 621 So. 2d 1373, 1379 (Fla. Dist. Ct. App. 1993).

## II. <u>Dunn's opinions are based on sufficient facts and his testimony is the product of reliable principles and methods.</u>

DTNA primarily contends that Dunn's methodology is unreliable because none of the documents he relies on support that an industry practice existed requiring DTNA to perform a safety analysis on the Columbia fuel system, and because he misapplies the FMEA methodology in opining that DTNA was required to continually monitor field reports and report the data to its engineers, even after DTNA allegedly developed the Columbia fuel system in the early 1990's. Under Rule 702, expert testimony should be based on sufficient facts or data, be the product of reliable principles and methods, and reliably apply the principles and methods to the facts of the case. *Kilgore v. Reckitt Benckiser, Inc.*, 917 F. Supp. 2d 1288, 1292-93 (N.D. Ga. 2013).

DTNA has continuously sought to portray the Columbia's fuel system as identical to predecessor fuel systems in order to link the system to an internal memo created by DTNA in 1990, a heavy truck fuel system study conducted by the National Highway Traffic Safety Administration in 1989 ("the Maryland study"),

and a former FMEA conducted by DTNA. It does so in an attempt to convince the Court that it has adequately complied with any industry standards that would have required it to perform a risk assessment and safety analysis on the Columbia fuel system, while at the same time speaking out the other side of its mouth and telling the Court that no such industry standard exists. Somehow, this lawyer-crafted, paradoxical argument is supposed to render Dunn's testimony unreliable.

In doing so, DTNA ignores several important facts: (1) DTNA did not conduct the Maryland study, (2) the Maryland study was not specific to any particular fuel system design and was a nonspecific safety analysis for a generic heavy truck fuel system, (3) the study does not contain a safety analysis specific to DTNA, (4) DTNA did not document that it made any changes in response to the Maryland study, (5) the study was completed approximately seven years prior to the development of the Century Class, and a decade prior to the development of the Columbia, and (6) additional significant changes were made specific to the Columbia design after the Maryland study was completed which should have triggered a safety analysis such as an FMEA update. *See supra* note 3; (Ex. 3, Dunn Dep. 172:18-174:5; Ex. 7, Moore 30(b)(6) Dep. 45:8-21, 171:25-173:6, Nov. 19, 2019; Ex. 10, Moore Dep. 64:3-81:6, March 11, 2020; Ex. 11, Maryland Study). Regardless, the substance of

DTNA's argument goes more to the weight of Dunn's testimony than its admissibility, and he has accounted for the Maryland study in formulating his opinions and testimony.[5]

Since DTNA has little ammunition with which to directly attack the reliability of Dunn's methodology, it pivots to a misleading argument that Dunn is not critical of any efforts DTNA made to incorporate changes to its fuel system after the Maryland study. This argument takes Dunn's testimony out of context and omits portions of his testimony which unequivocally state that DTNA failed to abide by industry and internal standards and practices by not performing an adequate safety analysis of the Columbia fuel system and by not taking into account field reports or market surveillance, and that its internal memos and supposed undocumented efforts are insufficient and do not constitute a proper safety analysis under industry and DTNA standards and practices. (Ex. 3, Dunn Dep. 31:10-15, 34:19-35:1, 46:3-47:11, 49:25-50:3, 128:10-137:23; Ex. 1, Dunn Report pp. 15-16; Ex. 2, Dunn Supp. Report pp. 3-4). Either way, much like DTNA's previous argument, this has nothing to do

---

[5] This is consistent with the majority of DTNA's arguments in support of excluding Dunn, which fail to even identify what Dunn's methodology is, much less explain why it is unreliable.

with the reliability of his methodology, and solely goes to the weight of his testimony if it goes to anything.

DTNA's next arguments focus on attacking Dunn's reliance on the FMEA manual and SAE J1739 as evidence of an industry practice requiring that DTNA should have conducted a safety analysis prior to production of the subject truck. However, even if these documents do not evince an industry standard, DTNA adopted these processes and failed to adhere to them. Further, Georgia law provides that even if the industry standard is not identical or similar to Dunn's proposed standard, this would not be conclusive as to DTNA's standard of care under the circumstances. *See BBB Service Co., Inc. v. Glass*, 228 Ga. App. 423, 432, 491 S.E.2d 870, 877 (Ga. Ct. App. 1997) (concluding that meeting, failing or exceeding industry standards is not dispositive of negligence). Regardless, Dunn's testimony is reliable because it draws on his educational and professional experience and training in safety analyses and is underpinned by industry standards and recommended practices set forth by the FMEA manual and SAE J1739. *See Affiliated FM Ins. Co. v. LTK Consulting Services, Inc.*, No. C06-1750JLR, 2014 WL 1494023, at *4-5 (W.D. Wash. April 16, 2014).

A. Under the facts of this case, Dunn can reliably opine that the standard of care for DTNA required it to perform a safety analysis because there is sufficient evidence supporting his opinion.

Dunn bases his opinions in part on two documents, the FMEA manual and SAE J1739.[6] The FMEA manual sets forth the FMEA process created by Chrysler, which merged with Daimler-Benz AG to form DaimlerChrysler, the parent corporation to the designer of the Columbia fuel system. (Ex. 3, Dunn Dep. 430:9-434:7). SAE J1739 is an automotive industry standard describing the FMEA process that was adopted from Chrysler, Ford, and General Motors' FMEA manual. (Ex. 4, SAE J1739-2002 p. 1). When read together along with other industry guidance, it becomes clear that by the time the 2005 Freightliner Columbia was manufactured, or at the latest, prior to the subject accident, the automotive and heavy truck industry standard of care required DTNA to perform a safety analysis on the Columbia's fuel system, especially since it had notice that there were ongoing issues with post-

[6] DTNA absurdly argues that Dunn should not be permitted to interpret and explain these documents to the jury because the jury is equally capable of reading these documents without Dunn's assistance. Obviously, evidence of the standard of care in this case must be presented through expert testimony. *See Goolsby v. Plastic Molded Technologies, Inc.*, Civil Action No. 1:07-CV-1947-ODE, 2008 WL 11381398, at *1 (N.D. Ga. Oct. 20, 2008).

collision fuel fed fires after the 1990 memo.[7] (Ex. 6, Moore 30(b)(6) Dep. 14:22-29:20, 51:17-117:17, 143:7-145:1, June 29, 2022).

DTNA goes to great lengths to describe the FMEA manual as a document that only pertains to automotive suppliers and not manufacturers. However, DTNA fails to inform the Court that in addition to being the manufacturer of the Columbia fuel system, DTNA is also the supplier of the fuel tank that is a component of the Columbia fuel system. (Ex. 3, Dunn Dep. 460:3-462:21). Therefore, even if the FMEA manual was confined to suppliers, which it is not, it would still apply to DTNA as the supplier of a component in a vehicle system. Additionally, this manual has been provided to suppliers to foster compliance with DMFEA procedures that were already being utilized by the "Big Three" manufacturers, including DaimlerChrysler, in their own design and production processes.

---

[7] While it is true that Dunn teaches his students multiple different forms of safety analyses, he has never taught that all industries endorse multiple different analyses, and his testimony and opinions in this case are not contradictory to his teachings, as argued by DTNA. (Dkt. No. 271-1 pp. 13-14). To the contrary, his testimony in this case indicates that a manufacturer or industry may choose to make SAE J1739 or any other specific safety analysis a standard practice. (Ex. 3, Dunn Dep. 257:20-258:3).

DTNA also argues that the FMEA manual only applies to the automotive industry and not the heavy truck industry. Other industry documents indicate otherwise. Quality System Requirements QS-9000 was developed by the Chrysler, Ford, and General Motors Supplier Quality Requirements Task Force, which DTNA acknowledges was later joined by DaimlerChrysler, who sought to disseminate the FMEA manual prior to manufacture of the 2005 subject vehicle. (Dkt. No. 271-1 p. 17; Ex. 12, QS-9000 Third Edition p. iv). QS-9000 was developed with the input of the Automotive Industry Action Group's Truck Advisory Group on specific requirements for truck manufacturers and describes the quality system expectations of the heavy truck industry. (*Id.* at pp. iv, 1). Special acknowledgment was given to Freightliner, DTNA's predecessor, for its input on truck manufacturer specific requirements. (*Id.*). QS-9000 references the FMEA manual as a source of information for quality systems and safety analyses, belying DTNA's argument that the FMEA manual is unrelated to the heavy truck industry. (*Id.* at 4).

By 2011, six years before the subject accident, the FMEA manual described the FMEA process as an industry practice. Regarding FMEA implementation, the manual states that "[b]ecause of the general industry trend to continually improve products and processes whenever possible, using the FMEA as a disciplined

technique to identify and help minimize potential concern **is as important as ever**. Studies of vehicle campaigns have shown **that fully implemented FMEA programs could have prevented many of the campaigns**." (Ex. 13, FMEA Handbook v. 4.2 p. 2-4; Ex. 4, SAE J1739-2002 p. 2). It also refers to SAE J1739 as an "industry standard". (Ex. 13, FMEA Handbook v. 4.2 p. 2-21). DTNA has specifically adopted SAE J1739 as its procedure for conducting DFMEAs. (Ex. 14, DTNA026217-26234).

The FMEA manual describes that it was drafted to harmonize the differences between Chrysler, Ford, and General Motors' guidelines and formats for insuring supplier FMEA compliance. (Ex. 5, FMEA Manual, Foreward 1st and 2nd Ed.). It requires that the FMEA analysis, as described in SAE J1739, be performed on any vehicle system or system component. (*Id.* at 10, 13). This is notable because as the vehicle manufacturer, only DTNA can perform a system DFMEA which would be composed of several different components from different suppliers. (Ex. 3, Dunn Dep. 460:3-462:21). Additionally, as described above, DTNA is the supplier of the fuel tank used in the 2005 Columbia's fuel system, so it was required by DaimlerChrysler's own guidance document to perform a DFMEA of the fuel tank and fuel system.

DTNA's 30(b)(6) representative, Anthony Moore, has admitted that the FMEA process is a standard engineering practice: "Daimler Trucks North America goes through an FMEA process as – you know, a – a standard engineering practice." (Ex. 7, Moore 30(b)(6) Dep. 33:10-12, 33:14-19, Nov. 19, 2019). This is supported by documents produced by DTNA through discovery in this action, demonstrating that it has performed FMEAs on similar fuel systems of other Freightliner models, but not on the Columbia. (Ex. 15, DTNA FMEA Discovery Responses). In fact, DTNA had been using the FMEA process to conduct safety analyses of its products since at least 1986, well before the Century Class or Columbia was developed by DTNA. (Ex. 3, Dunn Dep. 434:9-436:14; Ex. 16, Wirth Article). Despite this, DTNA has never performed a DFMEA or any other safety analysis specific to the Columbia's fuel system. (Ex. 7, Moore 30(b)(6) Dep. 111:20-25, Nov. 19, 2019).

DTNA's last argument is that even if the FMEA manual and SAE J1739 apply to its practices, they are only recommended standards and general guidance, and do not impose any requirements on DTNA. It is true that SAE J1739 does not contain an explicit directive commanding all heavy truck manufacturers to perform FMEA analyses on their products, and the document is entitled "**Surface Vehicle Recommended** Practice". However, it is not necessary for the documents to

specifically demand compliance to be admissible and relevant to the industry standard of care. "[T]he law in the Eleventh Circuit, as established by the former Fifth Circuit, is that **advisory guidelines and recommendations**, while not conclusive, are admissible as bearing on the standard of care in determining negligence." *Cook v. Royal Caribbean Cruises, Ltd.*, 2012 WL 1792628, at *3 (S.D. Fla. May 15, 2012) (citations omitted). Here, DTNA has performed no safety analysis on the Columbia's fuel system and has never passed on data concerning its performance in the field to its engineers, despite notice of over 80 fuel-fed post-collision fires involving the system since its development. (Ex. 7, Moore Dep. 29:22-31:2, Nov. 19, 2019). The documents support that DTNA was required to perform a safety analysis specific to the Columbia's fuel system, and it wholly failed to do so.

B. <u>Dunn may reliably opine that the DFMEA process is an ongoing and continuing effort that requires periodic updating because the FMEA manual and other documents support his opinion.</u>

DTNA believes that Dunn's opinions are also unreliable because he posits that the FMEA table is a "living document" which requires continuous updating throughout the life of the product. DTNA attempts to distinguish between Process FMEAs and Design FMEAs and argues that only Process FMEAs require updating after design completion. However, Dunn's opinion is clearly supported by the

FMEA manual and other industry documents. The FMEA manual states that "[t]he FMEA is a living document and should always reflect the latest design level as well as the latest relevant actions, **including those occurring after start of production**." (Ex. 5, FMEA Manual 3rd Ed. p. 31; Ex. 4, SAE J1739-2002 p. 4; Ex. 3, Dunn Dep. 143:21-144:17). In the FMEA manual, this assertion is found under the "Design FMEA" section. (*Id.*). Thus, while the DMFEA must be completed prior to production, it also must be continuously updated after production as market surveillance, customer complaints, and field reports are received by the manufacturer and distributors.

DTNA also generally states that FMEAs and SAE J1739 are not used to evaluate what happens to a vehicle and its systems in a collision, and that post-production crashworthiness analyses are simply not included in the recommended FMEA practice. This is also not true. An NHTSA study documents the agency's use of the FMEA process to identify high consequence failure modes of compressed-hydrogen fuel systems in hydrogen fuel cell vehicles after leak or rupture following a collision. (Ex. 17, NHTSA Study pp. v-vi). Academic literature reviewing the FMEA process demonstrates that FMEAs are frequently used across numerous industries to document safety testing of the crashworthiness of product systems. (Ex.

3, Dunn Dep. 352:3-355:16; Ex. 18, FMEA Literature Review Study). The Maryland study, which DTNA refers to as the most comprehensive study of post-collision fuel fed fires in heavy trucks to date, includes a generic FMEA analysis of the crashworthiness of a model heavy truck fuel system. (Ex. 11, Maryland Study; Ex. 3, Dunn Dep. 438:8-440:12). Lastly, SAE J1739 itself contains examples of typical failure modes that would result from vehicle collisions and should be described during the FMEA process. (Ex. 4, SAE J1739-2002; Ex. 3, Dunn Dep. 442:11-446:1).

## III. <u>Dunn's opinions are relevant and will be helpful to the jury in determining whether it was reasonable for DTNA to select its design for the Columbia fuel system.</u>

Lastly, DTNA argues that Dunn's opinions are irrelevant because they are not probative as to whether DTNA caused Leslie's injuries, and because under Georgia products liability law it is not relevant how a design process occurred or was documented. Both of these contentions are patently false, and the first one is also based on DTNA's irrational interpretation of the law. Dunn explicitly states in his testimony that if DTNA had correctly performed and updated a DFMEA with field reports, it would have led to design changes:

> Q. But my question, though, is you don't know, had that process been documented the way you want it documented, that – whether the result would have been any different or not?
>
> A. I feel it would have led to much further assessment of the fuel system.
>
> Q. And what basis do you have for that opinion, Dr. Dunn?
>
> A. That the rankings are so high that you have no choice but to go in and address that. And the primary way that you address those types of high rankings, especially the high severity, is through a design change.

(Ex. 3, Dunn Dep. 63:4-64:12). And even if Dunn had not opined that a proper safety analysis would have led to a design change, his opinion would still be helpful to the jury in assessing whether DTNA's failure to adopt an alternative design in light of the fact that it never performed a safety analysis was reasonable. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000) (finding that under Rule 702 so long as an expert's opinion can assist in determining any fact in issue, to qualify as relevant it does not have to bear on the ultimate issue of whether a product defect caused an accident).

*In re Yamaha* is instructive as to why DTNA's logic on this issue is flawed:

> Yamaha also objects to Williams's testimony as being unhelpful and irrelevant. According to Yamaha, Williams's testimony is unhelpful because it is "not connected to any concrete outcome or issue."

> Specifically, although Williams testifies that Yamaha failed to implement adequate design processes, he cannot link this failure to any specific engineering changes that would have been made. Indeed, as Williams testified, the processes he advocates "lead [] to further steps," rather than to a concrete change in the Rhino. In analyzing how Yamaha engineered the Rhino, inquiry into its design process will be relevant. According to Williams, if the processes he advocates are followed, "a vast majority of . . . safety-related incidents [] will not occur . . . ." The question of whether Yamaha followed its own prescriptions is relevant to the defect inquiry.

*Id.* at 453. Additionally, Georgia law provides that failure to comply with industry-wide practices is a factor that can be considered in determining the question of whether the product design selected was a reasonable one from amongst the alternative choices of which the manufacturer should have been aware. *See Banks v. ICI Americas, Inc.*, 264 Ga. 732, 736 n.6, 450 S.E.2d 671, 675 n.6 (1994); *Doyle v. Volkswagenwerk Aktiengesellschaft*, 267 Ga. 574, 577, 481 S.E.2d 518, 521 (1997). Thus, evidence of a manufacturer's deviation from industry design practices most certainly is relevant when that deviation impacts a manufacturer's capacity to reasonably choose from alternative, safer designs.

## CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that the Court deny DTNA's motion.

Respectfully submitted this 16th day of May, 2023.

HARRIS LOWRY MANTON LLP

*s/Stephen G. Lowry*
STEPHEN G. LOWRY
Georgia Bar No.: 460289
*s/Andrew J. Conn*
ANDREW J. CONN
Georgia Bar No.: 732541
*s/Spencer P. Mead*
SPENCER P. MEAD
Georgia Bar No.: 404464

410 E. Broughton Street
Savannah, GA 31401
Phone: (912) 651-9967
Fax: (912) 651-1276
steve@hlmlawfirm.com
aconn@hlmlawfirm.com
smead@hlmlawfirm.com

PARKER LAW GROUP

*s/Ronnie L. Crosby*
RONNIE L. CROSBY
*Admitted Pro Hac Vice*

101 Mulberry Street East
P.O. Box 487
Hampton, SC 29924
Phone: (803) 943-2111
rcrosby@parkerlawgroupsc.com

MORGAN LITIGATION GROUP, LLC

*s/Samuel K. Morgan, Jr.*
SAMUEL K. MORGAN, JR.
*Admitted Pro Hac Vice*

135 East Main Street
Lexington, SC 29072
Phone: (803) 359-6194
km@morganlitigation.com

***ATTORNEYS FOR PLAINTIFFS***

**CERTIFICATE OF FONT COMPLIANCE**

Counsel for Plaintiffs hereby certify that the foregoing has been prepared with one of the font and point selections approved by the Court in LR 5.1(B): Times New Roman (14 point).

**CERTIFICATE OF SERVICE**

This is to certify that I have this day caused a true and complete copy of the foregoing to be served upon all counsel of record by filing the same using the Court's CM/ECF filing system, thereby providing electronic notification of filing to all counsel of record as follows:

Stevan A. Miller, counsel for Defendant: smiller@deflaw.com

Barbara A. Marschalk, counsel for Defendant: bmarschalk@deflaw.com

Richard H. Grafton, counsel for Defendant: rgrafton@germer-austin.com

Respectfully submitted this 16th day of May, 2023.

HARRIS LOWRY MANTON LLP

s/*Stephen G. Lowry*
STEPHEN G. LOWRY
Georgia Bar No.: 460289
***ATTORNEY FOR PLAINTIFFS***

410 East Broughton Street
Savannah, Georgia 31401
Telephone: (912) 651-9967
Facsimile: (912) 651-1276
steve@hlmlawfirm.com